COOMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF THE TRIAL COURT
SUPERIOR COURT

HAMPSHIRE, SS                                    <u>DOCKET NO. 2480</u>CV00055

| | |
|---|---|
| **DOREEN REYES,**<br>*Plaintiff,*<br><br>v.<br><br>**AMHERST-PELHAM REGIONAL**<br>**SCHOOL DISTRICT,**<br>**MICHAEL MORRIS, and**<br>**DOUGLAS SLAUGHTER,**<br>*Defendants.* | **AMENDED COMPLAINT &**<br>**DEMAND FOR JURY TRIAL** |

## PARTIES

1. Doreen Reyes (formerly Cunningham) is an individual residing in Chicopee, Massachusetts.

2. The Amherst-Pelham Regional School District is a body politic established under the provisions of G.L. c. 71, § 15, whose powers, duties, and liabilities are vested in and exercised by the Amherst-Pelham Regional School Committee under G.L. c. 71, § 16A, and is an employer within the meaning of G.L. c. 151B and Title VII of the federal Civil Rights Act of 1964. The District and the Committee have a principal office at 170 Chestnut Street, Amherst, MA 01002.

3. Michael Morris was the Superintendent of the Amherst, Pelham, and Amherst-Pelham Regional Schools and is an employer within the meaning of G.L. c. 151B and Title VII of the federal Civil Rights Act of 1964, as amended. The Superintendent has a principal office at 170 Chestnut Street, Amherst, MA 01002.

4.  Douglas Slaughter is the Acting Superintendent of the Amherst, Pelham, and Amherst-Pelham Regional Schools and is an employer within the meaning of G.L. c. 151B and Title VII of the federal Civil Rights Act of 1964, as amended.  The Acting Superintendent has a principal office at 170 Chestnut Street, Amherst, MA 01002.

## FACTS

5.  Plaintiff Doreen Reyes is an African-American woman and from July 1, 2017, until October 13, 2023, was an employee of Defendant Amherst-Pelham Regional School District within the meaning of G.L. c. 151B and Title VII of the federal Civil Rights Act of 1964, as amended.

6.  On or about July 1, 2017, Defendant Amherst-Pelham Regional School Committees and Defendant Michael Morris as Superintendent of Schools entered into a contract with Plaintiff whereby Defendants hired Plaintiff as Assistant Superintendent of the Amherst, Pelham, and Amherst-Pelham Regional Schools.  The contract contained the following:

> 7. OTHER ACTIVITIES: The Assistant Superintendent may accept speaking, writing, lecturing, consulting or other engagements of a professional nature as she sees fit, provided that they do not detract from her duties as Assistant Superintendent; and shall submit annually to the Superintendent and the Committees a report of such activities.

Further to that provision, the addendum to Plaintiff's contract allowed her to engage in consulting during non-working hours.

7.  Plaintiff's contract also contained the following:

> 4. In addition, this Agreement and the employment of the Assistant Superintendent may be terminated by the Committees and the Superintendent prior to its expiration, for good cause by giving at least 120 days' notice to the Assistant Superintendent of the reasons for termination. The Assistant Superintendent may be paid for the one-hundred twenty days' in lieu of such notice.

8.  The contract also provided:

5. DUTIES: The Assistant Superintendent shall perform all the duties and responsibilities of the Assistant Superintendent as outlined in the job description, and as directed by the Committees and the Superintendent of Schools. The Assistant Superintendent shall have charge of the Districts' schools under the direction of the Committees in the absence of the Superintendent.

The Superintendent and the Committees, individually and collectively, shall, in their discretion, refer all criticisms, complaints and suggestions relating to the Assistant Superintendent to the Assistant Superintendent for study and recommendation. If the Committees do not bring such a criticism, complaint or suggestion to the Assistant Superintendent, then that criticism, complaint or suggestion may not be included in or referred to in the evaluation of the Assistant Superintendent. The Assistant Superintendent will attend all Committees meetings and citizen Committee meetings relating to school matters within the scope of responsibility of the Assistant Superintendent.

9. At all times, Plaintiff performed her job satisfactorily. Plaintiff's evaluations from Defendants ranged from satisfactory to exemplary. Defendants assigned Plaintiff the title of Assistant Superintendent for Diversity, Equity, and Human Resources and asked her to increase the racial diversity of the workforce.

10. At the time of Plaintiff's hire, teachers of color were approximately 20% of the faculty. By 2021-22, the figure had risen to approximately 31%.

11. The union that represents teachers in the District is the Amherst-Pelham Education Association (APEA). Some members of APEA harbor an animus toward Complaint because of her role in helping increase the racial diversity of the workforce.

12. In January 2023, Plaintiff learned that Peter Vamosy, a special education teacher (White), had verbally berated a special education student on or about December 1, 2022. On or about January 18, 2023, Plaintiff sent the employee a written notice of the District's intent to dismiss him. Defendant School District subsequently terminated Mr. Vermosy's employment.

13. ██████████ subsequently made allegations against three employees of Defendant

School District (Hector Santos, Delinda Dykes, and Tania Cabrera).  Those employees

are Christians and Defendants believed Plaintiff to be friends with them.

14. Defendant School District publishes *The Graphic*, which it describes as a "student

newspaper of Amherst Regional High School... An after-school staff is responsible for the

paper's layout, editorial policy, content decisions, and finances."[1] Statements in *The

Graphic* are statements of Defendant School District.  The teacher who edits *The

Graphic*, Sara Barber-Just, is White.

15. Through *The Graphic*, Defendants published allegations and innuendo regarding Plaintiff

with the goal of causing her to resign.

16. On or about May 9, 2023, Defendant School District published in *The Graphic* an article

alleging that three employees of Defendant School District (Hector Santos, Delinda

Dykes, and Tania Cabrera, who are Christians) had engaged in conduct that could amount

to discrimination on the basis of sex in violation of Title IX of the Education

Amendments of 1972, as amended.  The article included the following:

> Over the last two years, Amherst Regional Middle School students,
> parents, and staff members voiced concerns to district leadership about
> adjustment counselor Hector Santos and current eighth-grade guidance
> counselor Delinda Dykes, noting that the two routinely misgendered and
> deadnamed transgender students and staff, invoked anti-LGBTQ prayer at
> school, allowed religion to overflow into conversations with students and
> staff, and failed to provide support to students who were facing gender-
> based bullying or intimidation at school. Santos also posted religiously
> worded anti-LGBTQ material on a public Facebook page.
>
> This year, when Santos's daughter Tania Cabrera was brought on to serve
> as the seventh-grade guidance counselor, staff and students told *The
> Graphic* she also misgendered trans kids, told staff that a trans student had

---

[1] http://thegraphic.arps.org/about/

> reverted to using their legal name when they had not, did not report on an anti-LGBTQ harassment incident that was reported to her, and told a trans male student who went to her for support that she sympathized with his parents, who had "lost their daughter."

The article did not allege that Plaintiff herself had engaged in unlawful discrimination contrary to Title IX but that she was associated with the accused counselors socially:

> Cunningham has personal ties to the three counselors. In addition to Santos being slated to officiate at Cunningham's wedding in July, Santos referred to Dykes and her husband as his "siblings in faith" in a previously public Facebook post, which included pictures of him, Dykes, and Cunningham at a party.
>
> Fearing retaliation if they filed a complaint against the counselors with Cunningham, multiple staff members say they dropped their complaints and took to trying to create alternative forms of support to safeguard kids.

17. Defendants knew that alleging that Hector Santos, Delinda Dykes, and Tania Cabrera had discriminated unlawfully because of their religious beliefs would tend to reduce their standing in the community and expose them to hatred, ridicule, and contempt, and would tend to reduce Plaintiff's standing in the community and expose her to hatred, ridicule, and contempt.

18. Defendants used the religious beliefs of Hector Santos, Delinda Dykes, and Tania Cabrera in order to diminish their social standing and — on the basis of Plaintiff's association with Hector Santos, Delinda Dykes, and Tania Cabrera — to diminish the social standing of Plaintiff. Defendants also knew that as a result, Plaintiff's consulting clients would seek to distance themselves from her, and that Plaintiff would suffer damage as a result. In this way (associationally) Defendants discriminated against Plaintiff on the basis of religion.

19. By way of *The Graphic*, Defendants also interfered with Plaintiff's advantageous business relationships. Plaintiff had business relationships for economic benefit with

third parties, namely consulting contracts with the Hartsbrook School and the Common

School.

20. At all material times, Plaintiff was the sole manager of Another Lens Staffing & HR

Consulting Firm LLC ("Another Lens").  Plaintiff, through Another Lens, established

valuable business relationships with two private schools in Amherst, namely the

Hartsbrook School and the Common School.

21. Defendants, through Sarah Barber-Just, knew of these business relationships. Ms. Barber-

Just harbored ill will (including racial animus) toward Plaintiff and wished (i) Defendant

School District to bring Plaintiff's employment to an end, and (ii) to diminish or

eliminate Plaintiff's other sources of income.  Ms. Barber-Just's primary objective was

not to inform and educate but rather to undermine Plaintiff's standing so as to cause her

to either resign or be terminated, and to cause her distress and economic harm.

22. Defendants, by and through Sarah Barber-Just, interfered with relationship through

improper motive or means, namely: (i) calling or emailing the heads of the Hartsbrook

School and the Common School and stating that *The Graphic* was writing a story about

Plaintiff and her business relationships; and (ii) publishing an article in *The Graphic* that

named both schools in connection with Plaintiff.  By this time, *The Graphic* had already

published allegations that tarnished Plaintiff's reputation in the community. Defendants,

through Ms. Barber-Just, knew that the heads of the Hartsbrook School and the Common

School would fear reputational harm to their schools if *The Graphic* were to cause the

community to connect the schools with Plaintiff, whom Defendants had falsely portrayed

as having violated the rights of students.

23. The real motive in communicating with the Hartsbrook School and the Common School about their contracts with Plaintiff was not to obtain information but to induce these third parties to sever their relationships with Plaintiff. Shortly after — and because of — publication of the article in *The Graphic*, both the Hartsbrook School and the Common School severed their business relationships with Plaintiff. The termination of these business relationships caused and continues to cause Plaintiff monetary loss and reputational harm. Plaintiff's losses resulted directly from Defendants' conduct.

24. On May 13, 2023, the Amherst Pelham Education Association (APEA), the union that represents the District's teachers, published an open letter to the Amherst-Pelham Regional School Committee that accused Plaintiff of "unethical hiring practices; use of position of professional power to enrich self on school time; acting in ways that undermine the district's stated mission of equity and excellence; unsafe environment, where people do not come forward out of fear; toxic work environment that stifles open communication and collaboration," and called for Plaintiff's "immediate resignation."

25. On or about May 15, 2023, the Superintendent (Michael Morris) informed the *Boston Globe* that he had "worked with the district's Title IX officer to 'secure an outside attorney' who specializes in Title IX investigations." According to the *Globe*, Defendant Morris stated:

> This action was taken over a month ago, before the media coverage of ARMS began, and is continuing with additional concerns and complaints that have come in since then, which have been immediately forwarded to the investigator.

26. The president of APEA is Lamicko Magee (Black/African American), who had previously made statements lauding the increased racial diversity of the workforce

following Plaintiff's hire but later expressed the desire to replace Plaintiff as the Assistant

Superintendent.  In September 2022, Ms. Magee said to Plaintiff, "I want your job."

Subsequently, Ms. Magee obtained from the Department of Elementary and Secondary

Education an Assistant Superintendent license, effective April 7, 2023.

27. At a meeting of the Amherst-Pelham Regional School Committee on May 16, 2023, the

teachers' union, the Amherst-Pelham Education Association (APEA), called for the

termination of Plaintiff's employment and for the investigation of Defendant Morris.

Some of Defendants' White and Hispanic employees displayed signs that criticized

Plaintiff and made statements calling for the termination of her employment.  To the best

of Plaintiff's knowledge, Defendants have not taken any adverse employment actions

against these employees.

28. At the meeting on May 16, one of Defendants' employees, William Chapman (a

Black/African-American para-educator in the High School) read a statement in support of

Plaintiff.  Mr. Chapman also placed a sign at the back of the room that displayed statistics

regarding the increasing racial diversity of the workforce plus a tweet published by APEA

president Lamicko Magee.  Two days later, Defendants transferred Mr. Chapman away

from the High School against his wishes to a different school called the Summit

Academy.

29. Defendants School District and Slaughter also took adverse action against another of their

employees, Otis Collins, a Black/African-American para-educator in the Middle School,

who had engaged in speech supportive of Plaintiff.  Defendants re-assigned Mr. Collins

away from the Middle School against his wishes, supposedly because CCTV footage

appeared to show him distributing fliers in the parking lot on the night of the School

Committee meeting.

30. Defendants' adverse employment actions against William Chapman and Otis Collins,

who are Black/African-American, because of their expression of support for Plaintiff,

who is also Black/African-American, but not against White employees or Hispanic

employees who expressed criticism of Plaintiff, shows that race is a factor in Defendants'

treatment of Plaintiff.

31. Defendants directed those with concerns related to the allegations in *The Graphic* to

contact the District's Title IX officer, Marta Guevara, who is helping facilitate

Defendants' Title IX investigation.  Ms. Guevara has a personal animus against Plaintiff.

In or about 2018, Ms. Guevara's son, Gabby Scott, lost his job as a para-educator in the

Amherst-Pelham Schools in connection with his alcohol use.  Ms. Guevara blames

Plaintiff for the termination of her son's employment.

32. In the May 9 article in *The Graphic*, Defendants stated that Ms. Guevara had learned of

the allegations against Hector Santos, Delinda Dykes, and Tania Cabrera.  As Title IX

Officer, Ms. Guevara (who is Hispanic) could have instituted a Title IX investigation.

But she did not.  Nevertheless, Defendants have not placed Ms. Guevara on

administrative leave.  In fact, Defendants ensured that Ms. Guevara had an active role in

Attorney Mitnick's investigation, soliciting employees to speak with Attorney Mitnick

and scheduling their interviews and taking statements from some employees.

33. On or about May 22, 2023, Defendant Slaughter and Ben Herrington, chair of the

Amherst-Pelham Regional School Committee, met with Plaintiff and informed Plaintiff

that Defendants were placing her on administrative leave.  When Plaintiff asked the

reason for placing her on administrative leave, Defendant Slaughter stated that the reason

was "political." Defendants failed to abide by the contract, which provides:

> 5. The Superintendent and the Committees, individually and collectively, shall, in their discretion, refer all criticisms, complaints and suggestions relating to the Assistant Superintendent to the Assistant Superintendent for study and recommendation. If the Committees do not bring such a criticism, complaint or suggestion to the Assistant Superintendent, then that criticism, complaint or suggestion may not be included in or referred to in the evaluation of the Assistant Superintendent.

34. During Plaintiff's time in Defendants' employ, no other administrator was been placed on

administrative leave during an investigation.  In addition to placing Plaintiff on

administrative leave, Defendants took away her email access.  Plaintiff requested her

emails from Defendants' Director of Communications who refused to provide all

Plaintiff's emails on the basis that they were not subject to production under the Public

Records Law.  Of the approximately 20 employees that Defendants have placed on

administrative leave during investigations in the last 6 years, not one has had their email

access removed.  Placing Plaintiff on administrative leave (something Defendants had not

done to other administrator-level employees during investigations) and denying her

access to email were adverse employment decisions.

35. After the meeting on May 19, Mr. Herrington publicly disclosed the fact that the Acting

Superintendent had placed Plaintiff on administrative leave pending the outcome of the

Title IX investigation, thereby implying that Plaintiff was the subject of the Title IX

investigation.  He released the information to the media, including TV news channels, so

that it became breaking news.  Affirmatively publicizing the decision to place Plaintiff on

administrative leave and to falsely state that Plaintiff was the subject of a Title IX

investigation were adverse employment actions.

36. Similarly, at a School Committee meeting on June 20, 2023 (during open session as opposed to executive session) Mr. Herrington stated among the things that the School Committee could do "right now" would be to remove Human Resources from the job of Assistant Superintendent for Diversity, Equity, and Human Resources (Plaintiff's position). Unilaterally altering Plaintiff's responsibilities, role, and title would be an adverse employment action. Publicly declaring that Defendants should do so prior to the conclusion of the Title IX investigation is itself an adverse employment action.

37. The May 9 article in *The Graphic* alleged that a "nonbinary child... endured frequent misgendering by adults and transphobic bullying by peers at ARMS in seventh and eighth grade." *The Graphic* article states:

> But James was targeted more times across his eighth-grade year by yet another student, and while the boy was mostly transphobic toward James, he also mocked James's race and culture.
>
> In the moments when he was harassed in the middle of the day, he tended to go to Gayle-Brissett to report it rather than to Dykes. In this case, he discussed the act of racial discrimination one-on-one with Gayle-Brissett and subsequently agreed to be in a restorative circle with the student.
>
> But the next time the same student singled James out for abuse, it was more extreme, and he and his family were not satisfied with the school's response—more restorative justice.
>
> When James entered the boys' bathroom one day, that student "told me to get out," he said, "and when I resorted to using the girls' bathroom, he yelled in a hallway full of students, 'I thought you were a boy; what are you, trans?'" This ended up not just stigmatizing James but outing him to seventh-grade students who had not previously known he was trans and later harassed him about his gender identity, calling him a "tranny."

The student is ███████████.

38. On or about May 22, 2023, Defendant Slaughter stated publicly via an email to parents and others that "based on concerns raised in recent days, Assistant Superintendent Doreen

Cunningham has been placed on administrative leave pending the conclusion of the

current Title IX investigation." Defendant Slaughter thereby implied that Plaintiff was a

subject of the investigation.

39. On June 13, 2023, Defendants published another article in *The Graphic* that began:

> On May 13, when members of the Amherst Pelham Education Association
> (APEA)-the union representing teachers, paraeducators, and clerical staff-
> announced an all-district no-confidence vote in Superintendent Michael Morris
> and Assistant Superintendent of Diversity, Equity, and Human Resources Doreen
> Cunningham, they flagged Cunningham's alleged "unethical hiring practices" and
> "unsafe environment in which people do not come forth out of fear" as two of
> their reasons. They also said Morris had allegedly failed to supervise
> Cunningham's office and appropriately deal with "complaints of anti-LGBTQIA+
> behavior on the part of some staff which created an unsafe environment for
> children, especially those whose identities are marginalized."

In the opening paragraph of the article, Defendants re-published, without qualification,

the statement attributed to some APEA members that accused Plaintiff of "unethical

hiring practices." Defendants published no factual statements that would tend to support

the accusation of unethical hiring practices, and no statements disclosing the animus that

the APEA president harbors toward Plaintiff.

40. The June 13 article in *The Graphic* also states:

> ... An additional reason the APEA voted no confidence was Cunningham's
> alleged "use of position to enrich self on school time."

> ... Student reporters found that in addition to her district position,
> Cunningham is or was the manager or resident agent of four limited
> liability companies (LLCs): a diversity, equity, and inclusion (DEI)
> consulting firm, Another Lens Staffing & HR Consulting Firm LLC in
> Foxborough, Mass.; an insurance firm, The Cunningham Agency LLC in
> East Hartford, Conn., which dissolved in 2021; a wellness business,
> Western Mass Wellness LLC in Feeding Hills, Mass.; and a home
> improvement company, Millennial Contractors LLC in Chicopee, Mass.
> Cunningham is also a general partner in a limited partnership (LP) called
> Shorty's Autosales in New Bedford, Mass.

41. When Defendants published these statements, Defendants knew that the addendum to
    Plaintiff's contract expressly permits Plaintiff to engage in paid consulting work.  In the
    article, Defendants even quote the pertinent language of the contract:

> The Assistant Superintendent may, with notification to the Superintendent,
> undertake writing and speaking engagements, teach classes or seminars,
> engage in consultative work, and provide training and workshops for other
> school districts, organizations and agencies. The Assistant Superintendent
> may accept compensation for these activities without loss of pay under
> this Agreement provided that they are accomplished during vacation,
> holiday time or other non-working time, excluding sick or bereavement
> leave. Such activities shall not interfere, conflict or be incompatible with
> the performance of the duties required of the Assistant Superintendent
> under this Agreement and shall at all times comply with Chapter 268A of
> the General Laws.

42. Defendants re-published the APEA's false statement that Plaintiff had used her position to
    "enrich herself on school time," but offered no evidence that Plaintiff had used school
    time as opposed to non-working time.  Defendants knew that publishing these statements
    in *The Graphic* would tend to reduce Plaintiff's standing in the community and expose
    her to hatred, ridicule, and contempt.  Defendants also knew that Plaintiff's clients would
    seek to distance themselves from her, and that Plaintiff would lose business as a result.

43. In the June 13 article in *The Graphic*, Defendants further stated:

> According to a person who was interviewed by Title IX investigator Ed Mitnick
> of Just Training Solutions, Mitnick has spoken to over 50 people since the
> investigation was launched in April (each interviewee is granted a number). The
> results of the investigation will likely not be delivered until late summer. If
> Mitnick confirms a transphobic school environment at ARMS that limited
> students' access to education, the report will include serious recommendations for
> the district.
>
> Though Cunningham's contract expires on June 30, it may automatically renew
> on July 1. The terms of her contract require the School Committee and the
> superintendent to give 180 days' notice in order to terminate her contract, but she
> may be "paid for the 180 days in lieu of such notice."

By way of these statements, Defendants sought to generate an expectation in the community — and in the mind of Plaintiff — that Defendants District, Morris, and Slaughter would terminate Plaintiff's contract.

44. In the June 13 article in *The Graphic*, Defendants further stated that during the 6-year period 2017-2023 (since Plaintiff commenced work for Defendants), "There was a decrease of 31.5 white teachers."

45. Through counsel, Plaintiff asked to know the reason for being placed on administrative leave (something that -- to the best of Plaintiff's knowledge -- Defendants have not done to any other administrator during an investigation during Plaintiff's 6 years in Defendants' employ).  Defendants through counsel refused to state the reason.  Because Defendants repeatedly stated that they were conducting a "Title IX investigation," Plaintiff through counsel asked for written notice of the allegations against Plaintiff and whether she was a respondent.  The attorney who conducted the investigation for Defendants, Edward R. Mitnick, Esq., (executive director of Just Training Solutions, LLC) informed Plaintiff's counsel that

> I am not aware of any formal written complaint pertaining to Ms. Cunningham; however, I can share that a number of employees, former employees and parents have alleged allegations of retaliation, discrimination and other inappropriate conduct.  All of these allegations will be raised with Ms. Cunningham when we meet.

46. On June 14, 2023, Attorney Mitnick stated that the "investigation is not covered, guided by, or governed by the school[']s Title IX policy since it is not a Title IX investigation."

47. Defendant Morris told Attorney Mitnick not to inform Plaintiff why she was being investigated.  Even though Attorney Mitnick was supposedly conducting an investigation

of Defendant Morris, Attorney Mitnick took Defendant Morris's instructions not to

inform Plaintiff of the exact reasons why Plaintiff was being investigated.

48. Two other employees who were the subject of specific allegations in *The Graphic* (and

who are not Black/African-American) received from Defendant Slaughter notice of the

allegations against them and the procedures for investigating those allegations, expressly

pursuant to Title IX.  In contrast, Defendants have not provided Plaintiff with notice of

the specific allegations or the investigatory procedures.

49. The allegations of discrimination that Defendants published in the May 9 edition of *The

Graphic* are allegations of discrimination on the basis of sex.  Discrimination on the basis

of sex in any education program or activity receiving federal financial assistance is

subject to a federal regulation that provides:

> (c) Adoption of grievance procedures. **A recipient must adopt and
> publish grievance procedures that provide for the prompt and
> equitable resolution of student and employee complaints alleging any
> action that would be prohibited by this part** and a grievance process
> that complies with § 106.45 for formal complaints as defined in § 106.30.

34 C.F.R. § 106.8 (emphasis added).  Defendant School District is a recipient of federal

funding but has not adopted and published any Title IX grievance procedures other than

the policy titled *Sexual Harassment*.

50. Defendant School District's policy titled *Commitment to Nondiscrimination and

Educational Equity* states "the School Committees' intent to... Use designated procedures

to resolve the grievances of all individuals and groups."  The policy does not contain or

describe any "designated procedures."

51. Defendant School District's policy titled *Discrimination Complaints* states:

In the event that a student, staff person, or member of the public, including parents/guardians and volunteers, feels that he/she has been discriminated against, that individual may file a complaint with the District(s).  The following process will be followed:

- All formal complaints and administrative responses should be in writing.
- The individual designated to receive discrimination filings for the school/district will attempt to resolve the complaint in a manner satisfactory to the concerned parties. This may involve, but shall not be limited to, individual meetings with the parties involved, interviews with third parties and review of materials.
- If the actions taken do not resolve the matter, the complaint will be reviewed and responded to by the Superintendent within 10 days of receiving notification that resolution was not achieved. The Superintendent may investigate further or may explore ways to resolve the matter.
- If the matter under investigation remains unsettled, the individual may contact the appropriate agencies for the Commonwealth of Massachusetts.

52. Whereas Defendants provided similarly-situated employees who are not Black/African-American with descriptions of the allegations against them, Defendants have failed to reasonably describe the allegations against Plaintiff.

53. Attorney Mitnick informed Plaintiff that he was investigating "allegations that pertain to Ms. Cunningham," but has refused to state what those allegations are other than to write that "the scope of the investigation as it pertains to Ms. Cunningham will include, but not necessarily be limited to, potential violations of the school district's Discrimination, Retaliation, and Conflict of Interest policies."  Attorney Mitnick provided links to two of those policies (*Commitment to Nondiscrimination and Educational Equity* and *Member Conflict of Interest*) but not to any policy with the word "retaliation" in its title.

54. The policy tilted *Commitment to Nondiscrimination and Educational Equity* "affirms the School Committees' intent to... Use designated procedures to resolve the grievances of all individuals and groups."  It does not say what those "designated procedures" are.

55. The document titled *Member Conflict of Interest* consists of provisions for School Committee members, not employees. Plaintiff is an employee, not a School Committee member.

56. Defendants promised, via the policy titled *Commitment to Nondiscrimination and Educational Equity*, to use "designated procedures" but failed to identify any such procedures.

57. Defendants refused to state the basis for placing Plaintiff on administrative leave, other than to say that it is in connection with the "Title IX investigation."

58. Defendants told Plaintiff both that there <u>was</u> a Title IX investigation and that there was <u>not</u> a Title IX investigation, thereby undermining her ability to defend herself.

59. Defendants' investigation was a charade, not an independent, fact-finding inquiry. The true purpose of the investigation was nothing more than a pretext for terminating Plaintiff's employment.

60. Plaintiff's son is a student at the Amherst Regional Middle School. During the week of March 20, 2023, Plaintiff's son asked his teacher for a bathroom pass. Instead of a bathroom pass, the teacher gave him a flier titled "Support the Coblyn Family," which solicits funds for Kakas Coblyn:

> Due to Amherst Regional School's parental leave policy, reading specialist Kakas Coblyn has only 10 days of paid sick leave to recover from giving birth and to bond with her new baby.
>
> Please consider donating what you can to help her family spend more time together without worrying about money. Anything helps. Every 100 dollars can give them another day of recovery and bonding.

61. Some members of APEA blame Plaintiff for the Sick Leave Committee's decision to not provide additional parental leave to Kakas Coblyn. After Defendants published the May

9 article in *The Graphic*, the teacher discussed the article in class, in the presence of

Plaintiff's son.  By giving the flier to Plaintiff's son in lieu of a bathroom pass, and by

discussing *The Graphic* article in front of him, Defendants through their agent sought to

intimidate Plaintiff.

62. One reason for Defendants' decision to disparage Plaintiff in *The Graphic*, to place her on

administrative leave during an investigation, to affirmatively publicize the fact of her

being placed on administrative leave, to subject her to a sham investigation, and to

intimidate her is (1) Plaintiff's race and (2) her role in increasing the proportion of

Black/African-American employees and reducing the proportion of White employees.

Thereby Defendants discriminated Plaintiff on the basis of race, contrary to G.L. c. 151B

and Title VII of the federal Civil Rights Act of 1964, as amended.

63. An additional reason for Defendants' decision to disparage Plaintiff in *The Graphic*, to

place her on administrative leave during an investigation, to affirmatively publicize the

fact of her being placed on administrative leave, to subject her to a sham investigation,

and to intimidate her is Plaintiff's association with three employees who are Christians.

Thereby Defendants discriminated against Plaintiff on the basis of religion, contrary to

G.L. c. 151B and Title VII of the federal Civil Rights Act of 1964, as amended.

64. On July 18 and August 11, 2023, Plaintiff met with Attorney Mitnick.  In the course of

those meetings, Attorney Mitnick informed Plaintiff that Mr. Herrington had told him to

"find something" against Plaintiff.

65. On October 10, 2023, Defendant Slaughter sent to Plaintiff a redacted version of Attorney

Mitnick's report, a true copy of which is attached hereto as Exhibit A and executive

summary thereof, a true copy of which is attached hereto as Exhibit B.

66. Among other topics, Attorney Mitnick asked Plaintiff about allegations paraeducator
Emily Jones (White) had made about Delinda Dykes in March 2022.  Plaintiff stated that
she had asked Kathy Mazur (White) to investigate the complaint.  In his report, Attorney
Mitnick states that Kathy Mazur considered the complaint "unsubstantiated" (paragraphs
45 and 79).  At paragraph 79, Attorney Mitnick calls Ms. Mazur's investigation into Ms.
Jones's complaint "grossly inadequate."  Defendants did not terminate their contract with
Ms. Mazur.  In his report, Attorney Mitnick did not offer an opinion on the performance
of then-Superintendent Morris in supervising Plaintiff and Ms. Mazur in the handling of
Ms. Jones's complaint.

67. Attorney Mitnick asked Plaintiff about a meeting with Ms. Jones on September 14, 2022.
According to the report (paragraph 76) Ms. Jones herself did not allege that Plaintiff
asked her to apologize to Ms. Dykes.  Plaintiff expressly denied having asked Ms. Jones
to apologize to Ms. Dykes.  Further, Attorney Mitnick knew that Ms. Jones had stated in
writing that she did not feel safe in the Middle School (and not because of Plaintiff) so
had been offered positions in other school buildings.  Nevertheless, Attorney Mitnick
opined (paragraph 79) that "a reasonable person in [Ms. Jones's position] would believe
that she was being asked to apologize in order to get her job back."  Attorney Mitnick
characterized this as retaliation against Ms. Jones for having engaged in protected
activity.  Again, Attorney Mitnick did not offer an opinion on the performance of then-
Superintendent Morris in supervising Plaintiff in the handling of Ms. Jones's complaint.

68. In answer to Attorney Mitnick's questions regarding a flyer criticizing Ms. Magee,
Plaintiff stated, truthfully, that she (Plaintiff) was not the author of the flyer. Attorney
Mitnick characterized the flyer as "offensive and disturbing" (paragraph 89).  Plaintiff

stated that she had received it but would not give Attorney Mitnick the name of the actual

author (paragraph 96-99).  Plaintiff had a well-founded fear that Defendants would

retaliate against the author of the flyer.

69. On October 10, 2023, Defendant Slaughter stated in an email to Plaintiff:

> Please be advised that pursuant to Chapter 30A, Section 21(a)(1) of the
> General Laws, the Amherst-Pelham Regional School and Union #26
> School Committees will meet in Executive Session on Thursday, October
> 12, 2023, at 6:30 p.m. in the Library of the Amherst-Pelham Regional
> High School at 21 Mattoon Street, Amherst, MA to discuss your
> reputation, character, physical condition or mental health, rather than
> professional competence, and/or your discipline or dismissal, or
> complaints or charges brought against you. More specifically, the
> Committees will be meeting to consider the attached Investigation Report
> and Executive Summary and what action (if any), up to and including
> termination from employment, to take based on the findings of the Report.

70. The copy of the Investigation Report that Defendant Slaughter provided was redacted and

therefore incomplete. In this way, Defendants again violated the contract which provided:

> The Superintendent and the Committees, individually and collectively,
> shall, in their discretion, refer all criticisms, complaints and suggestions
> relating to the Assistant Superintendent to the Assistant Superintendent for
> study and recommendation. If the Committees do not bring such a
> criticism, complaint or suggestion to the Assistant Superintendent, then
> that criticism, complaint or suggestion may not be included in or referred
> to in the evaluation of the Assistant Superintendent.

To the extent that Defendants exercised "their discretion" in referring the criticisms and

complaints to Plaintiff by way of the redacted report, they did so in a manner that was

arbitrary and capricious.

71. On or about October 12, 2023, Defendant Committees met in executive session and voted

to terminate Plaintiff's employment.  In reaching their decision, Defendant Committees

considered Attorney Mitnick's report.

72. On or about October 13, 2023, Defendant Slaughter on behalf of the Defendant

Committees sent to Plaintiff a letter terminating her employment, a true copy of which is

attached hereto as Exhibit C.  The letter states two reasons for the termination, namely:

> 1.  Sufficient credible evidence exists to support the conclusion that you engaged
> in retaliatory conduct against a paraeducator in violation of policies ACC[1] and
> ACA after the paraeducator complained about alleged inappropriate conduct by
> another staff member toward LGBTQ+ students.
>
> 2.  Sufficient credible evidence exists to support the conclusion that you engaged
> in unprofessional and offensive conduct in violation of ARPS Policy ACC when
> you assisted in creating a highly demeaning and inflammatory flyer disseminated
> at the School Committee meeting on May 16, 2023.
>
>> [1] The investigation Report refers to Policy ACAP.  During the Executive
>> Session, it was identified that the reference to Policy ACAP should have
>> been Policy ACA.  The Committees' motions referred to Policy ACA
>> rather than ACAP.

Defendant Slaughter's letter also stated, "This letter serves to document that I, in my

capacity as Interim Superintendent, have also decided to terminate your employment,

effective with the date of this letter."

73. In considering Attorney Mitnick's report, Defendants again failed to abide by the

contract, which provides:

> 5. The Superintendent and the Committees, individually and collectively,
> shall, in their discretion, refer all criticisms, complaints and suggestions
> relating to the Assistant Superintendent to the Assistant Superintendent for
> study and recommendation. If the Committees do not bring such a
> criticism, complaint or suggestion to the Assistant Superintendent, then
> that criticism, complaint or suggestion may not be included in or referred
> to in the evaluation of the Assistant Superintendent.

74. Regarding the complaint that Emily Jones (White) made about Delinda Dykes (non-

White), Kathy Mazur (White) found that the complaint was unsubstantiated.  Attorney

Mitnick concluded that Ms. Mazur's investigation was "grossly inadequate" but

Defendants have taken no action against Ms. Mazur.  Regarding the flyer about Ms. Magee, Attorney Mitnick did not conclude that Plaintiff was the author but rather that she had reviewed it and "given feedback."  Citing these elements Attorney Mitnick's report, Defendants terminated Plaintiff's employment.  Thereby Defendants discriminated Plaintiff on the basis of race, contrary to G.L. c. 151B and Title VII of the federal Civil Rights Act of 1964, as amended.

75. On or about August 18, 2023, prior to the conclusion of the Title IX investigations (which included an investigation of Defendant Morris) Defendant Committees entered into a settlement agreement with Defendant Morris (White) whereby Mr. Morris resigned, and the Committees (a) publicly cleared him of any wrongdoing and (b) agreed to pay him his $178,500.00 salary for 10 months after the separation plus 54 days of unused vacation.

76. Following Defendant Morris's leave of absence and subsequent resignation, Plaintiff should have been able to assume his duties pursuant to paragraph 5 of the employment contract, which provided that "[t]he Assistant Superintendent shall have charge of the Districts' schools under the direction of the Committees in the absence of the Superintendent."  Instead, Defendant Committees appointed Defendant Slaughter, a White man, to the position of Interim Superintendent.  But for Defendants' decision to place Plaintiff on administrative leave and to falsely inform the public that Plaintiff was the subject of a Title IX investigation, Plaintiff would have had the opportunity to serve as Interim Superintendent.  Denying Plaintiff this opportunity was an adverse employment action.

77. Following the publication of Attorney Mitnick's report, Defendant School District terminated the employment of Hector Santos, Delinda Dykes, and Tania Cabrera.

78. Defendant School District subsequently determined that Hector Santos, Delinda Dykes, and Tania Cabrera had not violated Title IX.

## **CLAIM FOR RELIEF**

### **COUNT 1**
### DISCRIMINATION: RACE
AMHERST-PELHAM REGIONAL SCHOOL DISTRICT, MICHAEL MORRIS, AND DOUGLAS SLAUGHTER

79. Plaintiff repeats and incorporates by reference the factual allegations in the preceding paragraphs.

80. Defendants Amherst-Pelham Regional School District, Michael Morris, and Douglas Slaughter discriminated against Plaintiff on the basis of race in violation of G.L. c. 151B and Title VII of the federal Civil Rights Act.

81. As a result thereof, Plaintiff has suffered harm.

### **COUNT 2**
### DISCRIMINATION: GENDER
AMHERST-PELHAM REGIONAL SCHOOL DISTRICT, MICHAEL MORRIS, AND DOUGLAS SLAUGHTER

82. Plaintiff repeats and incorporates by reference the factual allegations in the preceding paragraphs.

83. Defendants Amherst-Pelham Regional School District, Michael Morris, and Douglas Slaughter discriminated against Plaintiff on the basis of gender in violation of G.L. c. 151B and Title VII of the federal Civil Rights Act.

84. As a result thereof, Plaintiff has suffered harm.

**COUNT 3**
<u>DISCRIMINATION: RELIGION</u>
AMHERST-PELHAM REGIONAL SCHOOL DISTRICT, MICHAEL MORRIS,
AND DOUGLAS SLAUGHTER

85. Plaintiff repeats and incorporates by reference the factual allegations in the preceding paragraphs.

86. Defendants Amherst-Pelham Regional School District, Michael Morris, and Douglas Slaughter discriminated against Plaintiff on the basis of religion in violation of G.L. c. 151B and Title VII of the federal Civil Rights Act.

87. As a result thereof, Plaintiff has suffered harm.

**COUNT 4**
<u>BREACH OF CONTRACT</u>
AMHERST-PELHAM REGIONAL SCHOOL DISTRICT

88. Plaintiff repeats and incorporates by reference the factual allegations in the preceding paragraphs.

89. By their acts and omissions Defendant Amherst-Pelham Regional School District breached its contract with Plaintiff.

90. As a result thereof, Plaintiff has suffered harm.

**COUNT 5**
<u>TORTIOUS INTERERENCE WITH BUSINESS RELATIONS</u>
MICHAEL MORRIS AND DOUGLAS SLAUGHTER

91. Plaintiff repeats and incorporates by reference the factual allegations in the preceding paragraphs.

92. Defendants Michael Morris and Douglas Slaughter tortiously interfered with Plaintiff's valuable business relations with third parties.

93. As a result thereof, Plaintiff has suffered harm.

**JURY DEMAND**

Plaintiff demands trial by jury on all counts so triable.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Honorable Court:

A.    Award Plaintiff damages (including emotional distress), plus her costs and her reasonable attorney's fees;

B.    Award Plaintiff back pay and front pay, and all other lost compensation and benefits, including pension;

C.    Award punitive damages; and

D.    Order such other and further relief as the Court deems just and appropriate.

<div style="margin-left:50%">

Respectfully Submitted
Doreen Reyes
By Her Attorney:


*/s/Peter Vickery, Esq.*
Peter Vickery, Esq.
27 Pray Street
Amherst, MA 01002
BBO# 641574
Tel. (413) 992 2915
Email: peter@petervickery.com

</div>

July 3, 2024